**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARY GAUNA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:22-CV-1390 JMB |
| | ) | |
| FRISELLA NURSERY, INC., | ) | |
| ANTHONY FRISELLA, JR., | ) | |
| ANTHONY FRISELLA, SR., and | ) | |
| JUSTIN VERBRYCK, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM AND ORDER**</u>

This matter is before the Court on Defendants Frisella Nursery, Inc., Anthony Frisella, Jr., Anthony Frisella, Sr., and Justin Verbryck's Motion for Summary Judgment.   (ECF No. 57).   The motion is fully briefed and ready for disposition.   The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).   For the reasons set forth below, the Court will grant the motion.

**Background**

This removed action arises following the termination of Plaintiff Mary Gauna's employment as a landscape design assistant for Defendant Frisella Nursery, Inc. ("Frisella Nursery").   In her third amended complaint, Plaintiff alleges that she was discriminated against based on her race and gender, that she was subject to a hostile work environment, and that her employment was terminated in retaliation for her co-worker's complaint about the alleged discrimination.   Plaintiff asserts claims of race and sex-based discrimination and retaliation against Defendant Frisella Nursery under the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat §§ 213.010, *et seq.*, and Title VII of the Civil Rights Act, 42 USC §§ 2000, *et seq.* (Counts

I and II); claims of race-based discrimination against all defendants under 42 U.S.C. § 1981 (Count III); and state-law claims of tortious interference against Defendants Frisella Nursery and Frisella, Jr. (Count IV).   (ECF No. 40).

Defendants now move for summary judgment.  (ECF Nos. 57, 59).  Defendants have filed a Statement of Undisputed Material Facts ("SUMF"), along with supporting exhibits which include the deposition testimonies of Plaintiff, the individual defendants, and other individuals employed at Defendant Frisella Nursery during the relevant time period.  (ECF Nos. 57, 58, & Exs. A-H).  Plaintiff opposes the motion and has filed a response to Defendants' SUMF.  (ECF Nos. 62, 63).  In her summary judgment response, Plaintiff states that she concedes her tortious-interference claim.  (ECF No. 63 at 13).  Defendants Frisella Nursery and Frisella, Jr. are therefore entitled to judgment in their favor on Count IV.  With respect to the remaining claims, the summary judgment record demonstrates the following.[1]

Plaintiff, a Hispanic female, was employed by Defendant Frisella Nursery as a landscape design assistant from September to December 2021.  (SUMF ¶¶ 1, 8).  At all relevant times, Defendant Frisella, Sr. owned Frisella Nursery, Defendant Frisella, Jr. was Vice President of Sales and managed day-to-day operations, and Defendant Verbryck was a landscape designer and Plaintiff's direct supervisor.  Id. ¶¶ 2-4.  Plaintiff's co-workers on the design team included Preston Jordan (also a supervisor), Nick Selby, and Corey Bishops.  Id. ¶¶ 9-11, 36.

At the time of Plaintiff's interview for the design position, she had completed all coursework necessary to obtain an associate's degree in horticulture, but she did not have much work experience in the field of landscape design.  Id. ¶ 17.  Plaintiff acknowledged that the company used a different design software program than the one she had used at school, and she

---

[1] The Court has deemed admitted all matters set forth in the SUMF which have not been specifically controverted.  See E.D. Mo. L.R. 4.01(E).  In addition, the Court has disregarded any purported "fact" which is not supported by citation to the record.

told Defendant Frisella, Jr. that adjusting to the new design software (i.e., Vectorworks) would present a "'big learning curve'" but she was "'up for the challenge.'"   Id. ¶ 18.   According to Plaintiff, Defendant Frisella, Jr. informed her he was looking for an individual to be his design assistant, he said "'really nice things to her,'" and he stated he thought she would be a "good fit" and "do well."   Id. ¶ 16.   Plaintiff was hired by Defendant Frisella Nursery during a time when the company's workload was increasing, and management's objective was to train the design assistants to become landscape designers.   Id. ¶ 34.

Plaintiff testified that, upon being hired, other employees informed her Defendant Frisella, Jr. had commented, "'I hired an Indian woman. It's going to be good to have a brown person in the design shop.'"[2]   Id. ¶¶ 38-39, 43.   Plaintiff felt uncomfortable about the comment and told Mr. Jordan that she did not want to work closely with Defendant Frisella, Jr.   According to Plaintiff, Mr. Jordan responded that he had informed human resources ("HR") of the comment and had "'filed a complaint.'"   Id. ¶ 41.   According to Mr. Jordan, he did not report the comment to HR in an official capacity, but he believes he possibly told HR manager, Liz Crase, about it in her capacity as his friend.   Id. ¶ 47.   Mr. Jordan characterized the comment as politically incorrect but considered it to be one of enthusiasm in connection with Plaintiff's hiring.   (ECF No. 57, Ex. E at 47:5-22, 81:2-8).   Mr. Selby heard about the comment indirectly and understood it to be one of excitement for having diversity in the workplace.   (SUMF ¶ 48).   Plaintiff also testified that during her first week of employment, Mr. Jordan, Mr. Selby, and Mr. Bishop asked her "what type of brown" she was.   (ECF No. 62, Ex. A at 99:1-4).

---

[2] Plaintiff alleged in her complaint that Defendant Frisella, Sr. had stated in response to Frisella Jr.'s comment, "Why would you hire a person like that? They always f—k you over."   (Compl., ¶ 6).   Plaintiff now admits, however, that Defendant Frisella, Sr. was not in fact present when the comment was made.   Plaintiff also does not dispute Defendant Frisella, Sr.'s testimony that he would never have said the response attributed to him.   (SUMF ¶¶ 49, 51).

Plaintiff was ultimately assigned as Defendant Verbryck's assistant because Defendant Frisella, Jr. had been working with Mr. Bishop, and Mr. Jordan had been working with Mr. Selby. In addition, Defendant Verbryck was in the office more, which afforded him greater opportunity to train Plaintiff, and Defendant Verbryck and Mr. Jordan had determined that Plaintiff could not have kept up with Defendant Frisella, Jr.'s workload.   Id. ¶¶ 22, 24-25.

During her employment, Plaintiff complained on occasion to Mr. Jordan about her co-workers.   Plaintiff reported that Mr. Bishop made her feel uncomfortable when he moved his desk behind her and raised his voice, and that in one instance he had screamed at her about her "crack whore mother" and lunged across the desk to attack her.   (ECF No. 57, Exs. A at 59:5-7, 67:2-10; E at 57:5-12).   Mr. Bishop later admitted to "blowing up" at Plaintiff but told Mr. Jordan he immediately backed off and apologized.   (SUMF ¶ 78).   Mr. Jordan reported the event to HR and Ms. Crase stated Plaintiff needed to report the incident directly to her.   Id. ¶ 77.   Ms. Crase also stated that she could not take any steps to relocate Mr. Bishop to a different office location until she knew the issue was ongoing as opposed to a one-time argument.   Id. ¶ 79.

Plaintiff further complained to Mr. Jordan that Defendant Frisella, Jr. would sit behind her and make neighing noises like a horse.   Plaintiff took this behavior as an "aggressive sexual innuendo" because Defendant Frisella, Jr. would refer to himself as the "Italian Stallion" and he would "talk about having sex with his wife and how his neighbors could see…"   (ECF No. 57, Ex. A at 67:12-24, 68:2-8).   Mr. Selby testified that Defendant Frisella, Jr. had commented once about how his neighbors were able to see him through his window "having sex with his wife" and "he was not bothered by it."   (ECF No. 62, Ex. F at 51:7-12).   Defendant Frisella, Jr. testified that his statement pertained to his neighbors being able to see him walking from his closet to the master bathroom, and that his exact comment was "'what they see they see.'"   (ECF No. 57, Ex. B at 95:12-18).

According to Plaintiff, while working on a project for a client named Mike Hawk, Defendant Verbryck and "the other employees" asked Plaintiff to repeat Mr. Hawk's name "three times fast to make it sound like a vulgar word."  (ECF No. 62, Ex. A at 182:6-9, 183:1-184:10).  In response, Plaintiff stated to Defendant Verbryck: "[Y]ou are supposed to be managing us. Please manage us."  (Id. at 183:14-15).  Defendant Verbryck testified that he did not recall the incident, and that he was unaware Plaintiff felt uncomfortable, harassed, or mistreated.  (ECF No. 57, Ex. D at 29:4-19, 61:13-19).[3]

Plaintiff trusted Defendant Verbryck and had a positive working relationship with him.  (SUMF ¶ 35).  Plaintiff also had a positive, friendly relationship with Mr. Jordan, and she trusted him enough that she felt she could complain to him.  (SUMF ¶ 36).  Defendant Verbryck testified that Plaintiff's work performance was "subpar," in part due to her ongoing failure to make necessary adjustments and corrections to design plans even after being asked to do so.  (ECF No. 57, Ex. D at 41:8-11).  He indicated that, compared to the other design assistants, she was slower to adapt to the software programs, and that there were notable issues with her general attitude and work ethic.  (Id. at 41:19-43:16, 53:11-55:19).  Defendant Verbryck maintains he discussed Plaintiff's performance issues with her throughout her employment.  (Id. at 72:12-17).  According to Plaintiff, Defendant Verbryck gave her "pointers here and there," but she did not feel termination was a possibility.  (ECF No. 62, Ex. A at 96:10-13).  Mr. Jordan testified that he had developed a Vectorworks training program and had attempted to train Plaintiff, but that his efforts were unsuccessful.  (ECF No. 57, Ex. E at 94:10-96:8).

---

[3] In her complaint allegations and during her deposition, Plaintiff described other acts by her co-workers which she perceived to be discriminatory.  For example, she contends that her co-workers would use "fake Mexican accents" and refer to her as "hash-tag legal," and that on one occasion she overheard Defendant Verbryck listening to a podcast about "managing Hispanic people" which had a negative tone.  (Compl. ¶ 21; SUMF ¶¶ 67, 69, 72).  Plaintiff makes no reference to any of these other incidents in her summary judgment response.

Plaintiff was ultimately terminated for "for lack of performance, inability to learn Vectorworks and the estimating software, lack of motivation, intent and initiative, inattention to detail, and timeliness." (SUMF ¶ 117). Defendant Verbryck made the termination decision after consulting with Mr. Jordan about his assessment of her performance and speaking with Defendant Frisella, Jr. about his concerns. Mr. Jordan agreed Plaintiff "was not performing at baseline, let alone in ways that were contributing to the team." Id. ¶ 113. Defendant Frisella, Jr. left the decision regarding Plaintiff's termination to Defendant Verbryck. Id. ¶ 114. Defendant Frisella, Sr. had no role in the decision to terminate Plaintiff. Id. ¶ 93. Following Plaintiff's termination, Defendant Verbryck provided her with written feedback on ways she could improve and noted her recurring performance issues. (ECF No. 57, Ex. K). Plaintiff was replaced by design assistant Lauren Fernandez, who is now a designer. (SUMF ¶ 58).

Defendant Frisella Nursery maintains policies pertaining to equal employment opportunity and commitment to diversity, as well as the prohibition of workplace harassment and retaliation. The latter policy prohibits any form of harassment or discrimination based on any protected characteristic, and employees are encouraged to report any related incidents to a supervisor or to HR. Id. ¶¶ 5-6. Although Plaintiff complained to Mr. Jordan about certain incidents, she never submitted a written complaint to management, and she never complained to Ms. Crase.[4] Id. ¶ 37.

## Legal Standard

Summary judgment is appropriate if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); Celotex Corp.

---

[4] Plaintiff asserts in her brief, however, that "[m]any of the above incidents were notified by HR, but because of the confusing and contradictory way in which HR complaints were processed, they [sic] not understood to be actual." (ECF No. 63 at 3).

v. Catrett, 477 U.S. 317, 322 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).   The substantive law determines which facts are material.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry summary judgment."   Id. Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.   Id.

A party moving for summary judgment always bears the initial burden of informing the Court of the basis of its motion.   See Celotex Corp., 477 U.S. at 323.   Once the moving party discharges this burden, the non-moving party must set forth specific facts demonstrating that there is a genuine dispute as to a material fact, not the "mere existence of some alleged factual dispute." Anderson, 477 U.S. at 247-8.   "'The nonmoving party may not rely on allegations or denials,' but rather 'must substantiate her allegations with sufficient probative evidence that would permit a finding in her favor on more than mere speculation or conjecture.'"   Carter v. Pulaski Cnty. Special Sch. Dist., 956 F.3d 1055, 1059 (8th Cir. 2020) (quoting Ball v. City of Lincoln, Neb., 870 F.3d 722, 727 (8th Cir. 2017)).   "There is no discrimination case exception to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial."   Torgerson, 643 F.3d at 1043 (quotation and citations omitted).

In passing on a motion for summary judgment, the Court must construe all facts and evidence in the light most favorable to the non-movant.   Anderson, 477 U.S. at 255. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"   Torgerson, 643 F.3d at 1042 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

## Discussion

Plaintiff brings her claims under Title VII, the MHRA, and Section 1981.   Both Title VII and the MHRA make it unlawful for an employer to discharge or otherwise discriminate against any individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race, color, or sex.   42 U.S.C. § 2000e-2(a); Mo. Rev. Stat. § 213.055(1)(a).   Section 1981 prohibits all racial discrimination in the making of private contracts, and it offers relief "when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." 42 U.S.C. § 1981; Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006).   Claims under Title VII, the MHRA, and Section 1981 are typically analyzed under the same framework. Watson v. CEVA Logistics U.S., Inc., 619 F.3d 936, 941 (8th Cir. 2010).   However, to establish a claim of discrimination under Section 1981, a plaintiff must show a protected factor was the "but for" reason for the discrimination, and not just a motivating factor.   Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 589 U.S. 327, 341 (2020).

In their summary judgment motion, Defendants argue that Plaintiff cannot show she was terminated due to her race or gender, or in retaliation for her engagement in any protected conduct. Defendants assert the summary judgment record shows beyond dispute that Plaintiff was terminated due to poor work performance and can point to no evidence of pretext.   Defendants further argue that Plaintiff's allegations do not rise to the level of a hostile work environment claim.   (ECF Nos. 59, 64).

Plaintiff's summary judgment response focuses entirely on her claims that she was subject to a hostile work environment.   Plaintiff fails to meaningfully address, let alone mention, her claims of discrimination and retaliation based on her purported unlawful termination. [5]

---

[5] Plaintiff has alleged that she was discriminated against during the hiring process, because

Additionally, in her response to Defendants' SUMF, Plaintiff admits that she was terminated "for lack of performance, inability to learn Vectorworks and the estimating software, lack of motivation, intent and initiative, inattention to detail, and timeliness."  (ECF No. 62 at ¶ 117). Because Plaintiff has failed to oppose summary judgment on these grounds, she has in turn waived these claims.  See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs., 558 F.3d 731, 735 (8th Cir. 2009) (the failure to oppose a basis for summary judgment constitutes waiver of that argument; it is not "the District Court's responsibility to sift through the record to see if, perhaps, there was an issue of fact").  The Court will therefore proceed to address Plaintiff's hostile work environment claims.[6]

Harassment of an employee based on a prohibited factor such as race or gender is prohibited conduct under Title VII.  Palesch v. Mo. Comm'n on Hum. Rts., 233 F.3d 560, 566 (8th Cir. 2000); see also Watson, 619 F.3d at 941 (8th Cir. 2010).  "Hostile work environment harassment occurs when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create and abusive working environment.'"  Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (cleaned up)).  "The same standards are generally used to evaluate claims of hostile work environment based upon sexual harassment and racial harassment."  Gibson v. KAS

---

Defendant Frisella, Jr. assumed she was Indian.  (ECF No. 40).  The Court notes that Plaintiff's hiring does not constitute an adverse employment action under the purview of Title VII, regardless of whether or not it was due to her perceived membership in a protected class.  See Cole v. Grp. Health Plan, Inc., 105 F.4th 1110, 1114 (8th Cir. 2024) (an adverse employment action is a "disadvantageous change to the compensation, terms, conditions, or privileges of employment").

[6] In their reply, Defendants argue that Plaintiff did not plead a hostile work environment claim based on sexual harassment.  (ECF No. 64 at 5-7).  The Court notes, however, Plaintiff's allegations in Count II that she was discriminated against because "Frisella Nursery allowed sexual and inappropriate comments and remarks to be made within the workplace."  (Compl., ¶ 46). Although tenuous, the Court will nevertheless construe Plaintiff's Complaint as asserting a sex-based hostile work environment claim.

Snacktime Co., 171 F.3d 574, 578 (8th Cir. 1999) (citations omitted).

To establish a prima facie hostile work environment claim, a plaintiff must show: "1) she was a member of a protected group; 2) the occurrence of unwelcome harassment; 3) a causal nexus between the harassment and her membership in the protected group; [and] 4) the harassment affected a term, condition, or privilege of employment."   Jenkins v. Winter, 540 F.3d 742, 748 (8th Cir. 2008) (citation omitted).   Where the harassing employee is the victim's co-worker, the plaintiff must also show that the employer "knew or should have known of the harassment and failed to take prompt and effective remedial action."   Id. (citation omitted); see also Vance v. Ball State Univ., 570 U.S. 421, 445-46 (2013) (the employer is liable only if they were negligent in permitting the harassment to occur).

Plaintiff argues that that Defendant Frisella, Jr.'s comment about hiring an "Indian woman" and Mr. Jordan, Mr. Selby, and Mr. Bishop's inquiry regarding "what type of brown" she was constituted racial harassment.   (ECF No. 63 at 5-9).   Plaintiff further argues that Defendant Frisella, Jr.'s comment about "having sex with his wife and how his neighbors could see," Defendant Frisella Jr.'s sexually overt conduct in neighing like a horse, the Mike Hawk incident, and Mr. Bishop's actions in screaming at her and lunging across the desk all constituted sexual harassment.   Id. at 9-13.

"The standards for a hostile environment are demanding, and conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment."   Alvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 420 (8th Cir. 2010) (quotation omitted).   "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."   Al-Zubaidy v. TEK Indus., Inc., 406 F.3d 1030, 1039 (8th Cir. 2005) (quotation omitted).   When evaluating a hostile work environment claim, the Court looks at "the totality of the circumstances, including the frequency

and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." Alvarez, 626 F.3d at 420 (quotation omitted).

Even accepting Plaintiff's narrative of the events and construing all inferences in her favor, the Court finds that she has nonetheless failed to make a prima facie showing of race or sex-based discrimination based on hostile work environment. Here, the conduct and comments attributed to Plaintiff's co-workers and Defendants Frisella, Jr. and Verbryck—although certainly disrespectful and inappropriate—are not sufficiently severe or pervasive to establish a hostile work environment claim. Henson v. Union Pac. R.R. Co., 3 F.4th 1075, 1083 (8th Cir. 2021) ("even some conduct well beyond the bounds of respectful and appropriate behavior is nonetheless insufficient to be severe and pervasive"). Based on this Court's precedent and the record before it, the Court cannot conclude that a reasonable trier of fact would find the alleged harassment "so intimidating, offensive, or hostile that it poisoned the work environment." Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999) (quotation and citations omitted). The Court therefore concludes that Plaintiff has failed to satisfy the high threshold for a hostile work environment claim based on either racial or sexual harassment, and that she has failed to raise a genuine issue for trial. Cf. Elsnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1058-59 (8th Cir. 2007) (affirming the district court's finding that a co-worker's alleged inquiries into whether the plaintiff, who was Arab-American, "had a harem" and "rode camels" in Egypt was an isolated incident that did not rise to the level of actionable hostile work environment harassment); Legrand v. Area Res. for Cmty. & Hum. Servs., 394 F.3d 1098, 1102-03 (8th Cir. 2005) (affirming the district court's finding that three instances of unwelcome sexual advances over a nine-month period, including graphic sexual propositions and even incidental unwelcome sexual contact, did not constitute hostile work environment harassment).

## Conclusion

Based on the foregoing analysis, the Court concludes that Defendants are entitled to judgment as a matter of law on all counts.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 57) is **GRANTED**.

A separate Judgment will accompany this Memorandum and Order.


_**/s/ John M. Bodenhausen**_
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE


Dated this 7th day of October, 2024.